**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 11 2012, 9:09 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT D.G.:
**HAROLD E. AMSTUTZ**
Lafayette, Indiana

ATTORNEY FOR APPELLANT T.S.:
**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:
**CRAIG JONES**
DCS, Tippecanoe County Office
Lafayette, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
Z.G. (MINOR CHILD), AND D.G. (FATHER), )
AND T.S. (MOTHER), )
    Appellants-Respondents, )
                )
             vs. ) No. 79A02-1202-JT-102
                )
THE INDIANA DEPARTMENT OF CHILD )
SERVICES, )
                )
    Appellee-Petitioner. )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
The Honorable Faith A. Graham, Magistrate
Cause No. 79D03-1111-JT-125

**September 11, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

In this consolidated appeal, T.S. ("Mother") and D.G. ("Father") separately appeal from the trial court's decision terminating each parent's parent-child relationship with Z.G. We affirm as to each parent.

**Issue**

Mother and Father each raise several issues for our review, which we restate as whether there was sufficient evidence to support the trial court's order terminating their separate parental rights as to Z.G.[1]

**Facts and Procedural History**

Z.G. was born in 2005 to Mother and Father, who were unmarried and were no longer engaged in a relationship by the time of Z.G.'s birth. Mother had two sons, J. and I., from prior relationships. J. had been diagnosed with juvenile diabetes and made regular use of insulin and an insulin pump. J. and I. both exhibited significantly escalated aggressive behavior toward one another. As Z.G. grew older, the other boys turned their aggression against him as well. Each boy would eventually be diagnosed with a number of psychological conditions.

Z.G. had only occasional contact with Father due to Father's repeated incarceration for various offenses. Most of these terms of imprisonment were related to Father's use or possession of illegal drugs, and Father also abused alcohol. Mother had a very limited

---

[1] Each parent also raises for our review whether termination of their parental rights as to Z.G. is in the child's best interest. Neither Mother nor Father provides coherent argument or citation to authority to support their arguments, however, and thus these issues are waived on appeal. See Ind. Appellate Rule 46(A)(8).

criminal history, consisting of a single misdemeanor conviction in 1998, but acknowledged a long-term problem with marijuana use. Members of Mother's family and network of friends also had substance abuse issues.

On August 26, 2009, I. pushed Z.G. from a second-story window in Mother's residence; Z.G. did not suffer significant injuries and was released from the hospital soon after. While at the hospital with Z.G., Mother left J. and I. in the care of her mother ("Grandmother"). Two days later, while still in Grandmother's care, J. suffered an overdose of insulin from an ultimately unknown cause; J. was comatose for a period, and suffered from ongoing mental health problems because of the insulin overdose. The Tippecanoe County Department of Child Services ("DCS") filed a Child in Need of Services ("CHINS") petition as to all three children on August 28, 2009 and removed the children from the home.

Because of I.'s behavior at school, at the time of the CHINS petition Mother and the children had already been engaged in some counseling and mental health services through Wabash Valley Alliance ("Wabash Valley"), and on at least one prior occasion I. had received extensive inpatient mental health care. After DCS filed the CHINS petition, the services extended to Mother, the three children, and eventually were expanded to Father.

During much of the pendency of the CHINS case, Mother resided in a house that she was unable to keep clean and free of excessive clutter. The house had a severe cockroach infestation. The upper floor smelled strongly of urine, and the scent became almost overpowering during hot weather. Dishes were unwashed and mold grew in places. Knives and needles for J.'s insulin were often left within reach of all three children.

3

Mother made efforts to improve the home. During a trial home visit with J. and Z.G., however, conditions began to decline again, and DCS terminated the trial home visit with Z.G. Conditions in Mother's home improved again after she moved to a different residence in West Lafayette, but soon after the move, clutter and a general lack of cleanliness at the home recurred. Eventually, DCS again removed J. from the home. Consequently, Mother lost her voucher for housing assistance and thereafter lacked a stable residence. Instead she began sleeping on friends' couches, at Grandmother's residence, or on a few occasions in a van parked underneath a bridge.

During the pendency of the CHINS proceedings, Mother did not obtain any stable part-time or full-time employment. Mother usually relied on Social Security, child support payments, charities, and social service organizations to support the family. After J.'s final removal from Mother's care, Mother lacked most of these sources of income. Mother also tested positive for marijuana on numerous occasions throughout the course of the CHINS action.

At the beginning of the CHINS proceeding, and intermittently through much of its pendency, Father was incarcerated. He was also serving probation throughout almost the entirety of the CHINS action. At the beginning of the CHINS case, Father was imprisoned for narcotics offenses and violation of a probation order. Father tested positive for use of synthetic marijuana in October 2010. Later that year, Father came to Mother's home and, while intoxicated, battered Mother with J. present in the home. As a result, Father was again incarcerated, and was released from jail in late May 2011.

4

After Father's release from jail in May 2011, he obtained housing and employment. In November 2011, however, Father again tested positive for use of synthetic marijuana.

On November 4, 2011, DCS filed its petition to terminate the parent-child relationship of Mother and Father as to Z.G.

On December 22, 2011, the trial court conducted a hearing on DCS's petition and took the matter under advisement. On January 26, 2012, the trial court entered its order granting DCS's petition and terminating the parental rights of Mother and Father as to Z.G.

Mother and Father now appeal.

### Discussion and Decision

#### Legal Standard

Mother and Father each contest the trial court's termination of their parental rights. Our standard of review is highly deferential in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). This Court will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. Id. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. Id.

Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental

responsibilities. <u>Bester v. Lake County Office of Family & Children</u>, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents, but to protect their children. <u>In re L.S.</u>, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), <u>trans. denied</u>.

Indiana Code Section 31-35-2-4(b)(2) sets out the elements that the DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

(A) That one (1) of the following is true:

    (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii)    The child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) That one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

If the court finds that the allegations in a petition described in Section 4 of this chapter

are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The trial court also must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion County Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied.

Termination of Mother's Parental Rights

In her appeal of the trial court's decision terminating her parental rights, Mother argues that DCS did not provide sufficient evidence to satisfy the requirements of subsections 31-35-2-4(b)(2)(B)(i) and (ii). See supra. This statute "is written in the disjunctive" so that only one of the requirements of subsection (B)—here, either that there is a reasonable probability the conditions necessitating a child's removal will not be remedied or that continuation of the parent-child relationship poses a threat to the child's well-being— need be proved by clear and convincing evidence. In re L.S., 717 N.E.2d at 209.

The evidence produced at the termination hearing indicated that Mother's relationship with several DCS and Wabash Valley caseworkers had deteriorated in the latter part of 2011, and even before then Mother's relationships with caseworkers was inconsistent—she got along well with some but was hostile toward others. In one incident, Mother threw one of

7

Z.G.'s coats at a caseworker, slightly injuring that individual and frightening Z.G. In September 2011, Mother ceased attending her own counseling sessions at Wabash Valley and was terminated as a client. She put little effort into restarting these services. Mother also tested positive for marijuana on numerous occasions during the CHINS proceeding, and insisted that she did not use marijuana but rather that the samples or test results were tainted.

Mother's living situation also deteriorated over the course of 2011. Mother rarely worked at any job and was unable to maintain any form of even part-time employment, so that most of the household income came from Social Security payments and child support payments. Once J. was removed from the home so that Mother's HUD housing waiver was discontinued, Mother was unable to continue to pay rent and thereafter lacked a stable residence. Instead, Mother stayed with friends, Grandmother,[2] and on at least two occasions in a van under a bridge.

While Z.G.'s removal from Mother's care came after he was pushed from a second-story window in the residence, the trial home visit was discontinued because of Mother's inability to supervise Z.G. and deteriorating conditions at Mother's home. Mother's arguments on appeal that she made efforts at counseling and therapy that give reasonable hope of a successful reunion with Z.G. request that we reweigh evidence, which we cannot do. See In re A.A.C., 682 N.E.2d at 544. Given the deteriorating conditions of Mother's interaction with numerous caseworkers, her inconsistent income, lack of housing appropriate for herself and even one child, and her continued use of marijuana, we cannot conclude that

---

[2] Grandmother had drug problems herself, had used drugs with Father during the early years of Z.G.'s life, and had been diagnosed with mental retardation.

8

there was insufficient evidence from which the trial court could conclude that the conditions necessitating Z.G.'s removal from the home would not be remedied. The trial court's termination of Mother's parental rights as to Z.G. is supported by sufficient evidence.

<u>Termination of Father's Parental Rights</u>

Like Mother, Father argues on appeal that there was insufficient evidence to establish that the conditions leading to Z.G.'s removal were unlikely to be remedied.

At the termination hearing, DCS presented evidence that Father had a significant criminal history related to his use of drugs and alcohol, including convictions for possession of methamphetamine and marijuana. As a result of these convictions, Father has been in and out of prison and has not maintained a consistent residence for more than six months since 2006. Father's interactions with Mother escalated toward violence at least once in 2010, when he arrived at Mother's home while intoxicated and battered her in front of J. Father also testified that he had only been caught engaging in violent conduct toward Mother when intoxicated, giving rise to an inference that he has engaged in violent conduct toward Mother on other occasions.

Wabash Valley caseworkers and Father acknowledged that Father's success in life and as a parent would depend upon his ability to remain clean of drugs. Yet in November 2011, approximately one month prior to the termination hearing, Father tested positive for use of synthetic marijuana that he consumed in a snack cake.

Father argues that the trial court's decision was erroneous because it failed to take into account his participation in drug rehabilitation programs and other court-ordered services,

9

improvements in his employment and housing situation, and his display of good parenting skills during supervised visitation. But Father's situation is unlike the facts in recent cases upon which he now relies. In H.G. v. Ind. Dep't of Child Servs, 959 N.E.2d 272 (Ind. Ct. App. 2011), trans. denied, the children involved had developed strong bonds with a frequently-incarcerated father, caseworkers testified that separation from their father would be devastating for the children, and both parents were fully engaged in services while incarcerated to shorten their prison terms and improve their parenting skills. In In re I.A., 934 N.E.2d 1127 (Ind. 2010), our Supreme Court reversed a trial court's termination of parental rights where there was not clear and convincing evidence that a reasonable probability that the reason for a child's placement outside of his father's care would not be remedied and that continuation of the parent-child relationship posed a threat to the child. The trial court is required to look beyond the statutory factors and at the entirety of the evidence in reaching its decision, and "'must subordinate the interests of the parent to those of the child.'" H.G., 959 N.E.2d at 289-90 (quoting In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009)). Thus, as Father notes, this Court and our Supreme Court have reversed trial courts that entered orders terminating parental rights where an affected parent has taken significant, unqualified good-faith steps to improve parenting skills and financial circumstances.

Yet we cannot agree with Father that the trial court erred in its contrary assessment of him or of the risk posed by placing Z.G. with him permanently. Here, Father was incarcerated at the time of Z.G.'s removal from the home. Thus, Father's absence due to his

10

criminal activities, taken together with Mother's failure to properly supervise Z.G. and his siblings necessitated Z.G.'s placement into foster care. Evidence presented at the termination hearing indicated that Z.G. "very much wanted a forever home," understood that this would likely not be with either Mother or Father, had not yet fully emotionally recovered from Father's incarceration after he battered Mother in 2010, and would be "devastated" and likely never recover if he was placed with Father on a seemingly permanent basis only to be dislocated once again. (Tr. at 143-144.)

Father availed himself of services and made improvements in his life after his release from jail in May 2011. Yet Father also has a history of probation violations associated with relapses into drug and alcohol use. In the course of the CHINS case he tested positive for the use of synthetic marijuana on two occasions, did not comply with the steps of his relapse plan when he used synthetic marijuana in late 2011, and was incarcerated during the CHINS case after he battered Mother in front of another of her children while he was intoxicated.

All together, then, we cannot conclude that there was insufficient evidence that the reasons for placement of Z.G. outside Father's home were unlikely to be remedied, nor that Z.G.'s well-being would not be placed at risk by placing him with Father. We therefore affirm the trial court's order terminating Father's parental rights as to Z.G.

## Conclusion

We cannot conclude there was insufficient evidence for the trial court to terminate Mother's and Father's parental rights as to Z.G. We therefore affirm the trial court's order as to each parent.

11

Affirmed.

RILEY, J., and CRONE, J., concur.