## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 23 2017, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Raymond P. Dudlo
Bamberger, Foreman, Oswald
and Hahn, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

J.M., (minor child),

and

B.G. (father),

*Appellant-Respondent,*

*v.*

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 23, 2017

Court of Appeals Case No.
26A04-1702-JT-426

Appeal from the Gibson Circuit Court
The Honorable Jeffrey F. Meade, Judge

Trial Court Cause No.
26C01-1602-JT-23

**Bradford, Judge.**

Appellant-Respondent B.G. ("Father") and M.M. ("Mother") are the biological parents of J.M., born in December of 2014. At the time, Father was incarcerated, with an expected release date in June of 2021. When J.M. was born, both he and Mother tested positive for THC, and J.M. was removed from Mother's care. Appellee-Petitioner the Indiana Department of Child Services ("DCS") petitioned to have J.M. declared a child in need of services ("CHINS"). The juvenile court adjudicated J.M. a CHINS, and DCS later filed a petition for the involuntary termination of the parents' rights ("TPR Petition").

Following a hearing, the juvenile court terminated Father's parental rights in J.M., finding that there is a reasonable probability that the conditions which resulted in J.M.'s removal and continued placement outside the home will not be remedied, continuation of the parent-child relationship poses a threat to J.M.'s wellbeing, termination of parental rights is in J.M.'s best interests, and there is a satisfactory plan for the care and treatment of J.M. Father contends that the juvenile court erred in finding that he was unlikely to remedy the conditions that led to J.M.'s removal and that continuation of the parent-child relationship posed a threat to J.M.'s well-being. Because we conclude that the

---

[1] Mother voluntarily relinquished her parental rights to J.M. on September 8, 2016.

juvenile court did not err in finding that Father was unlikely to remedy the conditions that led to J.M.'s removal, we affirm.

# Facts and Procedural History

On August 28, 2014, Father was sentenced to 540 days of incarceration for two counts of possession of a precursor by a methamphetamine offender and four years for dealing in methamphetamine and his previously-suspended ten-year sentence for Class B felony methamphetamine manufacture was ordered executed. Father's current expected release date is in June of 2021.

On December 11, 2014, J.M. was born with THC in his system, and Mother tested positive for THC. On December 23, 2014, J.M. was removed from Mother's care and placed with foster parents. On December 30, 2014, DCS filed its CHINS petition alleging the following:

> The child is under the age of eighteen (18) and resides with his mother, [Mother], in Gibson County, Indiana. On or about December 23, 2014, said child's mother tested positive for methamphetamine and admitted use. Said child was born on December 11, 2014, with THC in his system as evidenced by a positive meconium test. Said child's mother has a criminal history concerning battery and intimidation. Said child's mother is currently on probation. Said child's father is incarcerated for charges relating to methamphetamine. Said child's mother testing positive for methamphetamine, said child's meconium testing positive for THC, and said child's father being incarcerated for methamphetamine related charges illustrates their inability, refusal, or neglect to provide the child with necessary supervision, which seriously impairs or seriously endangers the child's physical or mental condition. The child

> needs care, treatment, or rehabilitation that the child is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court.

DCS Ex. 1 pp. 107-18. J.M. was adjudicated a CHINS after Father stipulated to the allegations on December 30, 2014, and Mother admitted to the material allegations on February 5, 2015. On February 5, 2015, the court held a dispositional hearing. On July 23, 2015, the court entered its dispositional decree ordering Father to participate in services, including—but not limited to—refraining from the use of drugs and alcohol, establishing paternity, completing a parenting assessment and all recommendations, completing a substance abuse assessment and all recommendations, submitting to random drug screens, and attending visitation with J.M. On February 11, 2016, DCS filed its TPR Petition.

[4] On October 19, 2016, the juvenile court held a hearing on the TPR Petition. At the time of the termination hearing, Father was participating in Purposeful Living Units Serve ("PLUS") program and Department of Labor ("DOL") program, for each of which he could potentially receive a six-month sentence reduction. Father admitted that he has struggled with methamphetamine addiction for approximately ten years. Father has not participated in a substance-abuse program since his incarceration because he does not yet qualify for the program. However, Father admitted that he needed such treatment.

[5] DCS family case manager Brenda Shaw ("FCM Shaw") was concerned about Father's drug use and testified that he will need long-term substance-abuse treatment once he is released. FCM Shaw further testified that since his

removal from Mother's care, J.M. has not returned. J.M. was placed with foster parents from December 23, 2014 until June 30, 2016. At that point, J.M. was placed in the care of a paternal uncle until August 17, 2016, when he returned to the foster parents' care. Court Appointed Services Advocate Joy Jines ("CASA Jines") testified that J.M. has been with his foster parents "basically his whole life" and is bonded to them and that they nurture him and meet his daily needs. Tr. p. 37. J.M.'s half-sibling, another child of Mother's, is also placed in the home with J.M. Additionally, his foster parents have allowed J.M. to have visitation with his biological family, and they have indicated that such visits would be allowed to continue.

[6]     Both FCM Shaw and CASA Jines opined that termination of Father's parental rights was in J.M.'s best interests because J.M. needed permanency, which Father would be unable to provide until J.M. was at least five or six years old. FCM Shaw also opined that the continuation of the parent-child relationship between Father and J.M. posed a threat to J.M.'s well-being "[d]ue to the methamphetamine and the past criminal history and the lack of housing and the [in]stability." Tr. p. 53. DCS's plan for J.M. upon the termination of Father's parental rights is adoption. On January 27, 2017, the court issued its order terminating Father's parental rights. The order provided, in part, as follows:

> C.     FACTS RELATING TO [J.M.]'S CONTINUED
>        REMOVAL FROM PARENTS' HOME AND CARE:
>        REASONABLE PROBABLITY OF PARENT NOT
>        REMEDYING REASONS FOR REMOVAL, THREAT
>        TO [J.M.]'S WELLBEING

1. As previously stated, Father was incarcerated when the child was born and throughout the duration of the CHINS cause. Father was given the opportunity to appear personally for the termination hearing, but refused to do so.

2. Father's earliest release date according to the Department of Correction is June, 2021.

3. While Father has been incarcerated, Father has had available to him multiple programs which make him eligible for sentence reductions.

4. Father has not yet started the substance abuse treatment program offered through the Department of Corrections, despite being ordered to do so in February, 2014, over two and a half years prior to the termination hearing.

5. Father admitted and the Court finds that Father has fought with a methamphetamine addiction for the majority of his adult life.

6. Father has attempted to address his addiction on and off through his life, but was never successful.

7. Father has a criminal history spanning ten years and multiple felony level crimes to which he either pled guilty or was found guilty.

8. Father currently estimates that he could possibly obtain two years' worth of sentence reductions if he participates in multiple programs.

9. Father believes that he could be released in "a little over two years" if he completes the aforementioned programs and petitions the sentencing court for a sentence modification.

10. The Court cannot rely on a vague possibility of early release when asked to determine the future of a child's life. While Father's optimism is commendable, there is no certainty that he will be available to parent his child until at least five additional years of incarceration.

11. A child should not be forced to wait five (5) years for permanency.

12. Father insists that his child should be placed with family, but the Court notes that [J.M.] was briefly placed with Father's brother, at Father's insistence, on June 20, 2016. That placement lasted a little over a month before Father's brother returned the child to his foster parents.

13. Father's criminal history evidences a pattern of conduct that is unlikely to be remedied. Father's continued arrests and convictions for drug related activities, despite receiving multiple jail sentences over the course of his ten year criminal history.

14. Father's incarceration alone is not reason to terminate his parental rights, but Father's past history of continuously reoffending and failure to address his methamphetamine addiction is.

15. Overall, Father has failed to remedy the situation that brought about the removal of the children. Based on the pattern of behaviors and continuing pattern of substance abuse by both Father, the Court finds that there is not a reasonable probability the situation which brought about the removal of the children is likely to be remedied. The Court finds that Father's past behavior is the best predictor of his future behavior.

16. The Court does not discredit Father's months of sobriety while incarcerated, but when considering the total length of involvement in the underlying CHINS, coupled with Father's habitual patterns of conduct, the Court simply assigns more weight to Father's conduct over the course of history, and less to his recent accomplishments while incarcerated. The Court finds no evidence that Father can remedy the situation—his incarceration, drug use and residential instability resulting therefrom—that brought about the removal of his children from his care.

….

CONCLUSIONS

The Court concludes this Court has jurisdiction over the parties and the subject matter of this case; and that notice has been provided to all persons required by statute in the most

effective means under the circumstances. Furthermore, based upon the above and foregoing, the Court also concludes that DCS has met its burden of proof, proving its petition to terminate Father's parental rights by clear and convincing evidence, to wit:

1. [J.M.] has been removed from his parents for more than six (6) months pursuant to the terms of the dispositional decree or the child has been removed from his parents' care for at least fifteen of the past twenty-two months, and
2. There is a reasonable probability that:
   a. The conditions which resulted in [J.M.]'s removal and continued placement outside the home will not be remedied;
   b. That continuation of the parent-child relationship poses a threat to [J.M.]'s wellbeing.
3. Termination of parental rights is in [J.M.]'s best interests.
4. There is a satisfactory plan for the care and treatment of [J.M.], that being adoption.

The court must terminate the parent-child relationship if DCS proves the elements of the Statute by clear and convincing evidence. Ind. Code § 31-35-2-8.

JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED: That DCS' petition for termination of parental rights is granted; and that the parent-child relationship between the [J.M.] and [Father] is hereby terminated.

IT IS THEREFORE FURTHER ORDERED, ADJUDGED AND DECREED: All rights, powers, privileges, immunities, duties, and obligations, including any rights to custody, parenting time, or support, pertaining to the relationship are permanently terminated. Either parent's consent to the adoption of each child is not required.

Order pp. 4-6, 9. Father contends that DCS produced insufficient evidence to sustain the juvenile court's termination of his parental rights in J.M.

# Discussion and Decision

[7] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to J.M.'s interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

[8] The purpose of terminating parental rights is not to punish the parent but to protect J.M. *Id*. Termination of parental rights is proper where J.M.'s emotional and physical development is threatened. *Id*. The juvenile court need not wait until J.M. is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[9] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable

inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date

the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

Father contends that DCS presented insufficient evidence to establish that the conditions leading to the removal of J.M. would not be remedied and that continuation of the parent-child relationship posed a threat to J.M.

## I. Reasonable Probability that the Conditions Resulting in Removal Would Not be Remedied

Father contends that the record does not establish that the reasons for J.M.'s removal would not be remedied.

> In determining whether "the conditions that resulted in the child [ren]'s removal … will not be remedied," *id.*, we "engage in a two-step analysis," [*K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1231 (Ind. Ct. App. 2013)]. First,

we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting [*In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)]) (internal quotation marks omitted). In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005)—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *K.T.K.*, 989 N.E.2d at 1231 (quoting *Bester*, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *See K.T.K.*, at 1234. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014) (footnote omitted).

[14] Here, the condition that led to J.M.'s removal from Mother's care was her and J.M.'s positive tests for THC upon J.M.'s birth, and J.M.'s continued removal from his parents' care has resulted from Father's ongoing incarceration and his failure to participate in services or bond with J.M. The question, then, is whether the juvenile court erred in concluding that Father was unlikely to remedy those conditions. Father specifically challenges the juvenile court's findings that (1) Father was given the opportunity to appear personally for the termination hearing, but refused to do so; (2) Father's earliest release date according to the Department of Correction is June, 2021; (3) Father has attempted to address his addiction on and off through his life, but was never

successful; (4) overall, Father has failed to remedy the situation that brought about the removal of J.M. and that, based on the pattern of behaviors and continuing pattern of substance abuse by Father, there is not a reasonable probability the situation which brought about the removal of the children is likely to be remedied; and (5) there is no evidence that Father can remedy the situation that brought about the removal J.M. from his care.

[15] As for the first challenged finding, a fair reading of the juvenile court's order indicates that Father's alleged failure to attend the final hearing played no part in the juvenile court's decision. The juvenile court's finding regarding Father's release date is, based on the evidence presented at the hearing, accurate, as Father had not yet completed any program that altered his release date. The third finding is also supported by the record, as Father acknowledged that previous attempts to address his drug use have not been successful.

[16] Father's challenges to the fourth and fifth findings seem to be based mainly on his correct assertion that nothing Father did directly resulted in J.M.'s initial removal from Mother's care, as he was incarcerated at the time. Be that as it may, it is apparent that the juvenile court is referring to J.M.'s continued removal from Father's care, which is due to Father's incarceration, a byproduct of his involvement with methamphetamine. In summary, Father's challenges to certain of the juvenile court's findings do not help him, as the findings in question are either not relevant to the juvenile court's decision or are supported by the record.

[17] In any event, while the Indiana Supreme Court has concluded that "incarceration is an insufficient basis for terminating parental rights[,]" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015), there is far more here. In addition to citing Father's incarceration, the juvenile court found that Father had not yet started the substance abuse treatment program offered through the Department of Correction, Father had struggled with methamphetamine addiction for the majority of his adult life, Father had attempted to address his addiction on and off through his life without success, Father has a criminal history spanning ten years including multiple felony level crimes to which he either pled guilty or was found guilty, and Father's criminal history indicates a pattern of conduct that is unlikely to be remedied. Most of the above findings are not challenged, and all are supported by the record. As the juvenile court summarized: "Father's incarceration alone is not reason to terminate his parental rights, but Father's past history of continuously reoffending and failure to address his methamphetamine addiction is." Appellant's App. Vol. II p. 12. The juvenile court chose to give Father's past history more weight as a predictor of future behavior than whatever recent efforts at reformation he has made while incarcerated, which it was entitled to do. Father has failed to establish that the juvenile court erred in this regard.

## II. Parent-Child Relationship Posed a Threat to J.M.

[18] Father also contends that the juvenile court erred in concluding that the continued parent-child relationship posed a threat to J.M. Indiana Code

section 31-35-2-4(b)(2)(B), however, is written in the disjunctive, meaning that DCS must establish only that *one* of the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[, or t]he child has, on two (2) separate occasions, been adjudicated a child in need of services[.]" Because we have already concluded that the juvenile court did not err in concluding that the conditions that led to J.M.'s removal would not likely be remedied, we need not address Father's argument in this regard.

[19] The judgment of the juvenile court is affirmed.

Najam, J., and Riley, J., concur.