FILED

May 07 2020, 7:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT J.A.

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEY FOR APPELLANT M.A.

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary
Termination of the Parent-Child
Relationship of: F.A., L.A.,
D.A., P.A., & Z.A. (Minor
Children)

J.A. (Mother) and M.A.
(Father),

*Appellants*,

v.

Indiana Department of Child
Services,

*Appellee*.

May 7, 2020

Court of Appeals Case No.
19A-JT-2570

Appeal from the Ripley Circuit
Court

The Honorable Ryan King, Judge

Trial Court Cause Nos.
69C01-1905-JT-16
69C01-1905-JT-17
69C01-1905-JT-18
69C01-1905-JT-19
69C01-1905-JT-20

**Brown, Judge.**

[1]     J.A. ("Mother") and M.A. ("Father," and together with Mother, "Parents") appeal the involuntary termination of their parental rights to their children F.A., L.A., D.A., P.A., and Z.A. (the "Children"). We reverse and remand.

*Facts and Procedural History*

[2]     F.A. was born in 2008, L.A. was born in 2009, D.A. was born in 2012, P.A. was born in 2013, and Z.A. was born in 2014. On September 8, 2016, the Department of Child Services ("DCS") received a report that De.A.,[1] F.A., and L.A. had excessive absences from school, and a home visit revealed sanitary concerns in the home, and DCS later filed petitions alleging the Children were children in need of services ("CHINS"). On September 29, 2016, the court entered an order finding the Children were CHINS based on Parents' admissions regarding the condition of the home and De.A., F.A., and L.A. missing seventy-five percent of the school days in session that year. The court issued a dispositional order requiring Parents to, among other things, participate in any recommended programs, permit family case managers and service providers to make announced and unannounced visits to the home, ensure the Children attend school, and maintain suitable and safe housing with adequate bedding and supplies of food. D.A., P.A., and Z.A. were removed from the home on or about December 1, 2016, and approved to be placed back

---

[1] Parents are also the parents of De.A., who was born in November 2006, and A.A., who was born in 2003. De.A. and A.A. were placed with their maternal grandmother and not subject to the termination order from which this appeal arises.

in the home on December 29, 2016, after DCS indicated the home was free of safety concerns. An order file-stamped March 1, 2017, approved the removal of the Children from the home and stated the home was unsafe and unsuitable for children. A progress report in July 2017 stated Parents had attended all scheduled visitations and required individual counseling. The report also noted DCS was seeking assistance from a clinical resource consultant to seek partial hospitalization for Mother to stabilize and establish self-care. The court entered an order in January 2018 stating Parents complied with the Children's case plan, attended counseling, and maintained a safe home environment; Father was working on positive coping skills; and there were still some issues with Valle Vista and the hospitalization program but DCS was working with Mother.

[3] The Children were returned to Parents in stages in 2018. In particular, in February 2018 the court granted DCS's motion for approval of a trial home visit for F.A. and L.A. which stated a family case manager observed the home to be free of safety concerns, Parents had made significant strides in maintaining a safe home environment for children, they would continue to participate in counseling, and Mother would continue to participate in home-based services. An order in April 2018 stated P.A. had been approved for a trial home visit and D.A. and Z.A. had been approved for overnight stays on the weekends. An order in September 2018 stated Parents had complied with the Children's case plan, attended required counseling, visited the Children, cooperated with DCS, and enhanced their ability to fulfill their parental

obligations. The order also stated that Father attended therapy every two to three weeks, and there were times when the home needed items picked up, dishes washed, and trash taken out, and Mother then complied with the request to remedy the situation. In October 2018, the court approved a trial home visit for Z.A. D.A. began a trial home visit in November 2018. According to the court, all of the Children had been returned to the home by November 7, 2018.

[4] A progress report dated November 28, 2018, stated the Children appeared to be happy and adjusted to living at home, the permanency plan was reunification, the projected date for the Children's permanency was March 15, 2019, and DCS was requesting case closure for F.A., L.A., and P.A. On January 9, 2019, DCS filed a notice of addendum stating that it was requesting case closure for all of the Children.

[5] On January 24, 2019, Mother had an altercation with her twelve-year-old daughter De.A. Mother yelled, struck De.A. with a towel, told her to "shut up," used derogatory language, took De.A.'s school device from her, and said "I've f---ing had it," "I'm going to knock you out," "I will pop you if I hear it again," and "no electronics, period." Transcript Volume II at 124, 127, 129-132. De.A. received a couple of cuts on her fingers during the struggle over a school device. The following day, the court terminated the home placement.

[6] According to a family case manager, DCS filed a petition to terminate parental rights on February 5, 2019, but the petition was dismissed.[2] The court approved a change in the permanency plan to adoption on April 30, 2019. On May 1, 2019, DCS filed a petition to terminate the parental rights of Parents as to the Children, and the court held a hearing in August 2019. Mary Smith testified she worked for Ireland Home Based Services, was assigned to Parents, and worked with Mother on parent aide services, budgeting, obtaining her license, organizing the home, and establishing a routine for the children. She indicated Mother was appropriate with the children, that she visited the house twice a week for four months and once a week for two months and that, when she closed her services near the end of August 2018, the home was clean and organized. Mother's counsel argued DCS had asked for case closure, all of the Children were home, DCS was relying solely on the altercation between Mother and De.A., it provided no services to address the altercation, "[w]e have new conditions here with no services provided," and Parents "did not have enough time to demonstrate that they couldn't remedy any physical or emotional abuse issues that the department felt they had and for the reasons of that removal on January 25th of 2019." Transcript Volume IV at 136.

[7] On October 2, 2019, the court terminated Parents' parental rights as to the Children. The court found Parents did not demonstrate an ability to provide

---

[2] When asked why the petition was dismissed, the family case manager testified "I think there was something with the legal side of it." Transcript Volume III at 169.

adequate care or supervision, did not show the capability to provide a home that is safe, clean and habitable, and were evicted from the home after the Children's final removal and were living in separate apartments. It found Father had not shown the ability to protect the Children from domestic violence or that he would be able to take care of five children while working a full-time job that does not pay enough for him to adequately support them or pay for day care. The court concluded there is a reasonable probability the conditions that resulted in the Children's removal will not be remedied and the continuation of the parent-child relationship poses a threat to the Children's well-being and termination of parental rights is in the Children's best interests.

## *Discussion*

[8] Mother argues that Parents regained custody of all the Children by November 2018, DCS requested the court to close the CHINS case on January 9, 2019, and she had an altercation with her daughter on January 24, 2019, which resulted in DCS initiating the termination proceeding and giving Parents no time to correct the behavior prompting the termination petition. She argues she was deprived of due process due to DCS's decision to terminate her rights based on a dispute with her daughter without offering her services to remedy the issue. She argues it is inherently unfair to sever her parent-child bond with De.A.'s five siblings based on the isolated incident. Father also argues DCS filed its termination petition before offering services to address Mother's altercation with De.A. and deprived him of due process. He argues the isolated altercation altered the trajectory of the entire case from case closure to

termination of parental rights as to five of De.A.'s siblings within a matter of days. He contends there were no safety concerns before the incident and there was insufficient evidence to support parental termination.

[9] DCS contends that, "[w]hile the incident [between Mother and De.A.] may have been the proverbial 'straw that broke the camel's back,' the evidence indicates that numerous and intensive reasonable efforts were provided Parents to reunify, but they failed or refused to benefit from the same." Appellee's Brief at 23. It argues that, even assuming it violated its obligation to provide domestic violence services, "this arguably does not amount to a due process violation" and Parents received reunification services but regressed and failed to demonstrate long-term improvements. *Id.* at 39.

[10] The trial court entered findings and conclusions. We determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[11] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *Id.*; *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). Although parental rights are of a constitutional dimension, the rights may be terminated where parents are unable or unwilling to meet their parental responsibilities. *In re D.B.*, 942 N.E.2d at 871. Before parental rights may be involuntarily terminated, the State is required to prove, among other things, that termination is in the best

interests of the child and that there is a reasonable probability the conditions that resulted in the child's removal or placement outside the home will not be remedied, the continuation of the parent-child relationship poses a threat to the well-being of the child, or the child has on two separate occasions been adjudicated a CHINS. *See id.* at 871-872 (citing Ind. Code § 31-35-2-4(b)(2)).

[12]     As a matter of statutory elements, it has been established that DCS is not required to provide parents with services prior to seeking termination of the parent-child relationship. *In re T.W.*, 135 N.E.3d 607, 612 (Ind. Ct. App. 2019), *trans. denied*. However, parents facing termination proceedings are afforded due process protections. *Id.* We have discretion to address such due process claims even where the issue is not raised below. *Id.* (citations omitted). CHINS and termination of parental rights proceedings "are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter," and procedural irregularities in a CHINS proceeding may deprive a parent of due process with respect to the termination of his or her parental rights. *Id.* (citing *In re D.H.*, 119 N.E.3d 578, 588 (Ind. Ct. App. 2019), *aff'd in relevant part on reh'g, trans. denied*). DCS's policy manual provides directions regarding the provision of services and states DCS "will provide family services to all children and families with an open case," "will make appropriate service referrals," and "will reassess the strengths and needs of the child and family throughout the life of the case and will adjust services, if necessary, to meet

identified needs." *Matter of D.H.*, 119 N.E.3d at 589 (citing Indiana Department of Child Services Child Welfare Policy Manual, Ch. 5, Sec. 10).[3]

[13] In addition to due process protections, we note the State's burden of proof for establishing the elements of the termination statute in termination cases is one of "clear and convincing evidence." *In re D.B.*, 942 N.E.2d at 872; Ind. Code § 31-37-14-2. If the State fails to prove any of the elements, then it is not entitled to a judgment terminating parental rights. *In re D.B.*, 942 N.E.2d at 872. The court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the court must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child and may consider a parent's prior criminal history, drug and alcohol abuse, history of neglect, lack of adequate housing and employment, and the services offered by DCS to the parent and the parent's response to those services. *Id.*

[14] "The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children." *In re I.A.*, 934 N.E.2d 1127, 1136 (Ind. 2010) (citation omitted). "Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* (holding "[w]e are not

---

[3] The Indiana Department of Child Services Child Welfare Policy Manual is now found at https://www.in.gov/dcs/2536.htm [https://perma.cc/BJ4M-8AYC] (last visited April 27, 2020).

convinced that all other reasonable efforts have been employed in this case to unite this father and son" and "we see little harm in extending the CHINS wardship until such time as [the father] has a chance to prove himself a fit parent for his child"); *In re T.W.*, 135 N.E.3d at 618 (finding DCS did not make reasonable efforts to preserve the parent-child relationship).

[15] The record reveals the CHINS proceedings began in 2016 due to the home's condition and school attendance. Upon DCS's recommendation, the Children were returned to the home in stages during 2018, and by November 7, 2018, all the Children were placed with Parents in the home. The November 28, 2018 report indicated the Children appeared to be happy and adjusted to living at home, Parents had maintained a good home environment, the permanency plan was reunification, and the projected date for the Children's permanency with Parents was March 15, 2019. On January 9, 2019, DCS requested case closure for all the Children. Then, on January 24, 2019, there was an altercation between Mother and De.A., and DCS abruptly changed course. We do not deny the seriousness of the altercation. Nevertheless, DCS does not assert that it kept the CHINS proceedings open in order to reassess the needs of the Children and Parents in light of the altercation and to adjust services to meet the identified needs. Instead, it moved immediately to terminate Parents' parental rights as to the five Children, filing termination petitions on February 5, 2019 and May 1, 2019. We are mindful that termination of parental rights is the most extreme sanction and "intended as a last resort, available only when all other reasonable efforts have failed." *In re I.A.*, 934 N.E.2d at 1136; *see also*

*In re T.W.*, 135 N.E.3d at 618 (reviewing the circumstances in totality in concluding DCS did not make reasonable efforts to reunify the father and child). We cannot conclude, in totality and under the circumstances, that DCS made all reasonable efforts to reunify Parents with the Children following the altercation with De.A. In light of DCS's actions following the altercation and its burden of proof, we reverse the trial court's order and remand for reinstatement of the CHINS cases and reassessment consistent with this opinion. *See Matter of D.H.*, 119 N.E.3d at 591 (remanding for reinstatement of the CHINS cases, a reexamination of the requirements for reunification, and a revised dispositional order).

Reversed and remanded.

Najam, J., and Kirsch, J., concur.