# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 31 2020, 10:29 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander W. Robbins
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: K.L. (Minor Child),

and

A.L. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 31, 2020

Court of Appeals Case No.
20A-JT-519

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause No.
32D03-1810-JT-21

**Tavitas, Judge.**

# Case Summary

[1] A.L. ("Mother") appeals the termination of her parental rights to K.L. ("Child"). We affirm.

# Issue

[2] The sole issue on appeal is whether sufficient evidence supports the termination of Mother's parental rights to the Child.

# Facts

[3] The Child was born to Mother and R.M. ("Father")[1] on April 22, 2017. The Child was born prematurely with opiates and cocaine in his system. The Child was admitted to the neonatal intensive care unit due to respiratory distress and drug withdrawal. Mother tested positive for cocaine and admitted to using heroin and cocaine while pregnant. Mother reported that she had been going to a methadone clinic but that she continued using cocaine while enrolled at the clinic. The Hendricks County Department of Child Services ("DCS") removed the Child from Mother's care. Upon the Child's discharge from the hospital, the Child was placed in foster care, where he has remained.

---

[1] The trial court also terminated Father's parental rights, but Father is not a party to this appeal.

[4] On May 3, 2017, DCS filed a petition alleging that the Child was a child in need of services ("CHINS"). On August 1, 2017, the trial court found that the Child was a CHINS. Specifically, the trial court found:

> 30. The coercive intervention is necessary to be sure Mother receives the mental health treatment, substance abuse treatment and parenting support she needs to provide appropriate care for this young infant who also has potential medical issues concerning his growth, eyesight, and possible hepatitis.

> 31. Without the coercive intervention of the Court it is very unlikely Mother will receive or accept the substance abuse and mental health treatment she needs to be a sober caregiver for [the Child].

> 32. [The Child's] physical condition is seriously endangered as a result of his Mother's inability to become and remain sober and provide him the safe daily care he needs.

> 33. [The Child's] physical condition is seriously endangered because his father cannot provide him appropriate housing. Father has shown little interest in providing any of [the Child's] needs.

Ex. Vol. VII p. 46.

[5] The trial court entered a dispositional order in September 2017. The trial court ordered Mother, in part, to: (1) not use or consume any illegal controlled substances and only take prescription medications for which she had a valid prescription; (2) not to consume alcohol; (3) obey the law; (4) complete a parenting assessment and follow all recommendations; (5) complete home-

based counseling; (6) complete a substance abuse assessment and follow all recommendations; (7) submit to random drug screens; and (8) attend all scheduled visitations with the Child. The trial court also later ordered Mother to complete a mental health evaluation and complete any recommended treatment.

[6] Thirty-two-year-old Mother has been addicted to heroin since she was nineteen years old and abused prescription pain medications before using heroin. Between August 2017 and March 2019, Mother consistently tested positive for methadone, including on some days she did not attend the methadone clinic. Although Mother made some progress toward sobriety, she relapsed in February 2018. Between February 2018 and March 2019, Mother consistently tested positive for illegal substances, including heroin, fentanyl, morphine, phenobarbital, Xanax, chlordiazepoxide, methamphetamine, and oxycodone. Although DCS requested that Mother submit to 134 drug screens, Mother failed to appear for sixty of the requested drug screens.

[7] At a hearing on February 28, 2018, Mother was observed bouncing the Child up and down dangerously close to a banister on the second floor of the Courthouse. Mother appeared impaired during the hearing and tested positive for heroin, methadone, and fentanyl. Mother overdosed two times in May 2018. Mother claims to have participated in inpatient drug treatment programs at Fairbanks twice in May 2018 and once in September 2018; mental health treatment at Valle Vista in August 2018, October 2018, and February 2019; and been hospitalized several times, including for a facial fracture in January 2019.

Mother, however, did not provide DCS with timely releases so that DCS could confirm Mother's compliance with the programs. DCS has offered additional treatment options to Mother, but Mother has not participated in those other options.

[8] Mother has been diagnosed with depression, substance/medication induced anxiety disorder, and opioid use disorder. Mother, however, failed to attend individual therapy, failed to participate in home-based case work consistently, and failed to attend child and family team meetings. Mother also failed to participate in supervised visitations consistently and frequently attended supervised visitations while under the influence of substances. Mother also visited with the Child without informing DCS that she had a contagious bacterial infection. Mother never progressed beyond supervised visitation with the Child and last visited the Child in February 2019.

[9] Mother has several prior convictions, including convictions for: operating while intoxicated with endangerment, a Class A misdemeanor (2008); theft, a Class D felony (2009); dealing in a schedule IV controlled substance, a Class C felony (2010); and criminal recklessness while armed with a deadly weapon, a Class D felony (2012). Mother has repeatedly violated the terms of her probation. During the CHINS and termination of parental rights proceedings, Mother was charged with (1) possession of a narcotic drug (heroin), a Level 6 felony, on

May 26, 2018;[2] (2) operating a vehicle while intoxicated, a Class C misdemeanor, and operating a vehicle with an alcohol concentration equivalent to .15 or more, a Class A misdemeanor, on August 7, 2018; (3) violating her driving conditions, a Class C misdemeanor, on January 2, 2019; (3) possession of a narcotic drug (heroin), a Level 6 felony; operating a vehicle while intoxicated, a Class A misdemeanor; and violating her driving conditions, a Class C misdemeanor, on April 9, 2019. Mother was also arrested on April 18, 2019, when she appeared in the Hendricks Circuit Court for an initial hearing while she was intoxicated.

[10] The Child has experienced developmental delays. In June 2018, the Child was examined by a neurodevelopmental pediatrician, who diagnosed the Child with a global development delay[3], hypotonia[4], dysmorphic features[5], and feeding difficulties. Testing revealed that the Child is missing part of a chromosome and possibly has Smith Magenis Syndrome[6]. Each week, the Child has speech

---

[2] Mother was found passed out in a bathroom stall in a Walmart. When officers asked her to come out of the stall, Mother attempted to flush items down the toilet. Mother was incoherent, disoriented, and had blood trickling down her arm from her elbow. Mother dropped a coin purse that contained a substance consistent with heroin.

[3] Dr. Celanie Christensen testified that a global development delay is "delays in two or more of the four developmental domains which are gross motor, fine motor, speech and social." Tr. Vol. II p. 135.

[4] Dr. Christensen testified that hypotonia is "low muscle tone. . . ." Tr. Vol. II p. 136.

[5] Dr. Christensen testified that dysmorphic features are "unusual physical findings," such as a "broad forehead." Tr. Vol. II p. 136.

[6] Smith Magenis Syndrome is a genetic syndrome that "causes mild to moderate intellectual disability," "short stature," "significant sleeping and behavior problems," and "characteristic facial findings." Tr. Vol. II p. 137.

therapy, occupational therapy, and physical therapy. The Child has a special diet and sees a nutritionist. The Child's doctor has recommended that the Child not be exposed to second-hand tobacco smoke, including smoke on clothes. Mother and maternal grandmother, however, continued to smoke tobacco.

[11] In October 2018, DCS filed a petition to terminate Mother's and Father's parental rights.[7] Fact-finding hearings were held over five days between November 14, 2018, and May 16, 2019. Although Mother was scheduled to appear for a continuation of the fact-finding hearing on April 10, 2019, before the hearing started, Mother turned herself into jail due to an arrest warrant. Mother was not eligible to bond herself out because she was extremely intoxicated. Mother appeared late to the April 12, 2019, hearing, and Mother failed to appear for the final day of the fact-finding hearing on May 16, 2019. At the time of the April 2019 fact-finding hearings, DCS was recommending that Mother participate in a lengthy in-patient drug treatment program.

[12] On January 31, 2020, the trial court entered extensive findings of fact and conclusions thereon terminating Mother's and Father's parental relationship

---

[7] The Child's maternal grandmother, C.L., filed a petition for guardianship in May 2018. Foster parents filed a motion to intervene in the guardianship proceedings, which the trial court granted. The trial court then joined the guardianship case with the termination of parental rights action. In a footnote, Mother contends that joining the guardianship and termination of parental rights cause was "an inequitable ganging-up on the parents" because the foster parents were allowed to interrogate witnesses, file objections, and make arguments. Appellant's Br. p. 5 n.2. Mother, however, does not directly challenge the joining of the guardianship proceedings. As such, we do not address the issue.

with the Child.  In March 2020, Mother filed a motion seeking leave to file a belated notice of appeal, which the trial court granted.  Mother now appeals.

## Analysis

Mother appeals from the termination of her parental rights.  The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children.  *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013).  "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'"  *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)).  We recognize, of course, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights.  *Id.*  Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'"  *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility.  *In re. I.A.,* 934 N.E.2d 1127, 1132 (Ind. Ct. App. 2010).  We consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  We must also give "due regard" to the

trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[15] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)." Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[16] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (B) that termination is in the best interests of the child; and
>
> (C) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[17] Mother challenges the trial court's conclusion that there is "a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied."[8] I.C. § 31-35-2-4(b)(2). "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'"

---

[8] Mother also argues that there was no reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Child. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Consequently, the DCS was required to demonstrate by clear and convincing evidence a reasonable probability that *either*: (1) the conditions that resulted in the Child's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the Child. *See, e.g.*, *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005). The trial court here found a reasonable probability that the conditions that resulted in the Child's removal or reasons for placement outside the home of the parents will not be remedied, and there is sufficient evidence to support that conclusion. Accordingly, we do not address whether the continuation of the parent-child relationship poses a threat to the well-being of the Child.

*In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester,* 839 N.E.2d at 152). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[18]    The trial court found:

> 443.   There is a reasonable probability the conditions that resulted in removal of the child from the home or the reasons for continued placement outside the home will not be remedied. Neither parent has demonstrated the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that Mother will be able to maintain sobriety and mental health stability in order to care and provide adequately for [the Child]. . . .
>
> 444.   [The Child] was removed from Mother's care on May 2, 2017 after child tested positive for opiates and mother admitted to heroin use during her pregnancy.
>
> 445.   Mother has a history of drug addiction that goes as far back as her teenage years. She has continuously abused drugs and more recently abused alcohol throughout the CHINS

proceedings, resulting in overdose and various drug-related and alcohol-related criminal convictions and charges.

446. Mother has been offered numerous services and support throughout the CHINS proceedings; however, she has failed to take advantage of the services offered her.

447. Rather than work with the Family Case Managers to participate in services that could help her overcome her addictions, she chose to continue in her own plan of treatment, which consisted of Fairbanks short term in-patient treatment as well as primarily methadone treatment.

448. Mother's participation in the methadone programs could not be monitored by DCS because Mother refused to sign releases to allow DCS to gather the information and speak with her counselors.

449. DCS offered Mother the opportunity for individual counseling; but Mother would not participate in said counseling and instead would admit herself into the hospital for medication treatment whenever anxiety and depression overcame her.

450. Mother's failed attempts at her own mental health treatment and substance abuse treatment have led her to continue to abuse drugs and alcohol and get herself into criminal trouble which includes showing up intoxicated to jail and to court proceedings.

451. There has been no improvement and no progress in Mother's condition from the time the child was removed to the final date of the Fact-Finding Hearing and based on her history, no progress is expected in the near future.

452. Mother's freedom from incarceration is uncertain, having 3 pending criminal cases with various charges.

453. Mother has no income and no ability to support herself outside of the assistance Grandmother provides. Grandmother provides Mother's housing and transportation.

\* \* \* \* \*

31. DCS has proved by clear and convincing evidence that there is a reasonable probability the conditions that resulted in removal of the child from the home or the reasons for continued placement outside the home will not be remedied. Neither parent has demonstrated the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain sobriety and stability in order to care and provide adequately for [the Child].

Appellant's App. Vol. II pp. 97-98, 105.

[19]     Mother does not challenge any of the trial court's specific findings of fact. Mother, however, argues that the trial court's findings ignore her ongoing efforts, including her methadone treatment, inpatient substance abuse treatment, and inpatient mental health treatment. Mother also contends that the trial court relied too heavily on her criminal history, which "consisted of cases where [Mother] was convicted prior to [the Child] being born or where charges were still pending." Appellant's Br. p. 12. Given Mother's ongoing efforts to "rid her life of drug use" and her strong bond with the Child, Mother argues it is "evident that [Mother] is likely to remedy the conditions that led to the removal and continued DCS involvement. . . ." *Id.* at 12-13.

[20] The Child was removed from Mother's care in April 2017 because the Child was born prematurely with opiates and cocaine in his system. Mother tested positive for cocaine and admitted to using heroin and cocaine while pregnant. Although Mother has been offered and provided significant services, Mother made little, if any, progress in remedying her substance abuse issues.

[21] Mother failed to attend individual therapy, failed to participate in home-based case work consistently, failed to attend child and family team meetings, and failed to participate in supervised visitations consistently. Most importantly, Mother has made minimal progress toward achieving sobriety. Even while the fact-finding hearings were being held on DCS's petition to terminate Mother's parental rights, Mother continued testing positive for illegal substances, including methamphetamine, oxycodone, fentanyl, Xanax, and methadone. Although Mother was attending a methadone clinic, she occasionally tested positive for methadone on days that she did not go to the clinic. Mother also repeatedly appeared at court hearings, the jail, and visitations with the Child while impaired by drugs or alcohol.

[22] As a result of Mother's addiction issues, she continues to be charged with related crimes, several of which were still pending at the time of the fact-finding hearings. Mother has been addicted to illegal substances for more than a decade and is in no position to care for the Child. The guardian ad litem testified that Mother and Father could not "take care of themselves. And, if they can't take care of themselves as adults, how can they take care of [the Child]." Tr. Vol. IV pp. 149-50. Mother admitted during her testimony that

she needed "time to make [her]self better and capable to provide [the Child] with his best care." *Id.* at 242. Given Mother's ongoing addiction issues, the trial court's conclusion that Mother was unlikely to remedy the reasons for the Child's removal and continued placement outside Mother's home is not clearly erroneous.

## Conclusion

[23] The trial court's order terminating Mother's parental rights to the Child is not clearly erroneous. We affirm.

[24] Affirmed.

Kirsch, J., and Pyle, J., concur.